# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 17-00248-01-CR-W-BP |
| Barrett Prelogar, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the DEFENDANT'S MOTION FOR REMEDY FOLLOWING EVIDENTIARY HEARING [Doc. 67] filed on October 19, 2018, by defendant Barrett Prelogar ("Prelogar"). At issue in the motion is the remedy, if any, which should be afforded to Prelogar based on an *ex parte* interview conducted by government personnel with an individual who previously provided legal services to Prelogar. On October 2, 2018, the undersigned held an evidentiary hearing on the circumstances surrounding and substance of the referenced interview. Prelogar was present and represented by his counsel, Justin Gelfand and Sanford Boxerman. The government was represented by Assistant United States Attorney Paul Becker and David Zisserson, a trial attorney with the Department of Justice's Tax Division. At the hearing, two witnesses were called: James Wirken and Special Agent Alex Churchman with the Internal Revenue Service. Additionally, the following exhibits were offered and admitted into evidence:

| Number | Description |
|---|---|
| Gov't #1 | Thornhill letter to Ketchmark |
| Gov't #2 | Thornhill letter to Shartar |
| Gov't #3 | Thornhill email to Churchman (10/10/2015) |
| Gov't #4 | Thornhill email to Churchman (10/16/2015) |
| Def't #5 | Prelogar MOI |
| Def't #6 | Matthews MOI |

On the basis of all the evidence adduced at the evidentiary hearing and following due consideration of the parties' extensive briefing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1.  Alex Churchman is a Special Agent with the Criminal Investigation Division of the Internal Revenue Service. Tr. at 32.

2.  Special Agent Churchman was assigned the lead case agent in a criminal tax investigation of Prelogar. Tr. at 32.

3.  For nearly 45 years, James Wirken ("Wirken") was a practicing attorney in Kansas City. Missouri. Tr. at 5, 22.

4.  Beginning in the early 1990s, Wirken provided legal services to Prelogar.[1] Tr. at 5.

5.  Special Agent Churchman was aware that Wirken had previously represented Prelogar and Special Agent Churchman wanted to question Wirken after Wirken's name came up during the criminal investigation as being involved in a number of Prelogar's transactions. Tr. at 34-35.

6.  Special Agent Churchman wanted to evaluate whether Prelogar had a possible reliance-on-counsel defense. Tr. at 35.

7.  On March 21, 2017, Wirken met with Special Agent Churchman and Paul Becker, an Assistant United States Attorney in the Criminal Division in the United States Attorney's Office for the Western District of Missouri. Tr. at 6, 7, 32, 33.

8.  On March 21, 2017, Wirken was still on federal supervised release. Tr. at 6.

9.  On March 21, 2017, Prelogar had not yet been indicted. Tr. at 28.

10. During the pre-indictment criminal investigation of Prelogar, he was being represented by a Kansas City attorney, Mark Thornhill. 52

11. In September of 2014, Thornhill sent a letter to the case agent who preceded Special Agent Churchman that described certain financial arrangements involving Prelogar and noted that the particular actions were taken "after meeting with Wirken." Tr. at 54-55; Gov't #1.

---

[1] In 2012, Wirken surrendered his law license and, in 2014, Wirken plead guilty to federal money laundering charges and was sentenced to a period of incarceration of thirteen months followed by a term of supervised release. The conduct leading to Wirken's license surrender and criminal conviction did not involve his representation of Prelogar.

12. In October of 2015, Thornhill sent an email to Special Agent Churchman providing copies of a deposition that Wirken had given in a prior case, stating "Mr. Prelogar wants you to have the transcripts, as they demonstrate his actions have all been lawful." Tr. at 52-53; Gov't #2.

13. Two weeks prior to the interview with Wirken, on March 8, 2017, Special Agent Churchman met with Thornhill regarding the ongoing criminal investigation of Prelogar. Tr. at 57.

14. At the meeting, Thornhill brought up the issue that Prelogar's actions were undertaken upon Prelogar's reliance on legal counsel. Tr. at 60.

15. Following the meeting, Thornhill sent a letter summarizing the meeting, noting that the case against Prelogar involved "issues of accounting and advice of counsel." Tr. at 58-59; Gov't #3.

16. The interview was arranged through communications between Wirken's criminal defense attorney and AUSA Becker. Tr. at 6-7, 33.

17. Wirken was "absolutely" willing to speak with the government about Prelogar's criminal case as long as he was assured that he was not a target. Tr. at 6-7.

18. Wirken attended the interview at the U.S. Attorney's office "voluntarily." Tr. at 6-7, 33.

19. The interview lasted approximately one to two hours. Tr. at 7, 33-34.

20. The interview was not recorded, neither audio nor video. Tr. at 18, 35.

21. During the interview, "at least a half dozen times," Wirken was asked about conversations he had with Prelogar. Tr. at 8.

22. In response to such questions, Wirken said that he could not tell Special Agent Churchman and AUSA Becker "anything about the conversations from Mr. Prelogar to [Wirken] or from [Wirken] back to Mr. Prelogar because it was attorney-client privileged." Tr. at 8-9, 23-24.

23. In response to such questions, Wirken may have revealed the substance of some communications that he had with Prelogar but not direct quotes. Tr. at 14.

24. However, Wirken does not believe that he disclosed any confidential communication between Prelogar and him. Tr. at 22, 24.

25. Wirken did tell Special Agent Churchman and AUSA Becker that Prelogar consistently sought and acted on Wirken's legal advice. Tr. at 12.

3

26. The government never directly or explicitly asked Wirken to disclose attorney mental impressions. Tr. at 9-10.

27. Wirken did believe that Special Agent Churchman and AUSA Becker were familiar with the mental impressions that he had formulated in advising Prelogar, explaining:

> [T]here was a series of documents[2] that were discussed in the conversation, and it was clear to me that they knew all of the information about things that I had done. . . . [Y]ou wouldn't have to be the smartest attorney to understand that what I did [as shown in the documents] was based upon advice that I gave to the clients and the clients gave me the go-ahead and do it. . . . [T]hey clearly knew the mental impressions that I had had with regard to why I basically set out [the plan for Prelogar's] asset protection the way I did.

Tr. at 10.

28. In answering some questions, Wirken explained to Special Agent Churchman and AUSA Becker not only what he had done for Prelogar, but also why he had done it. Tr. at 11.

29. Specifically, Wirken told Special Agent Churchman and AUSA Becker that he set up the asset protection plan "because without the asset protection, the bankruptcy that [Prelogar] would have been taking would have been involving every single asset . . . as opposed to having multiple different LLCs." Tr. at 11.

30. Wirken was asked about Prelogar's employment and compensation agreement with an entity called Bareskull that had been drafted by Wirken and Wirken told Special Agent Churchman and AUSA Becker "that the language in the document spoke for itself." Tr. at 14-15.

31. Wirken was asked if he was aware that Prelogar allegedly used corporate funds to pay personal expenses and had made certain cash withdrawals to make payroll obligations. Tr. at 12-13, 16.

32. Wirken acknowledged being aware of the practices and explained that he did not view either practice as improper. Tr. at 13, 16-17.

33. Following the interview, Special Agent Churchman prepared memoranda regarding Wirken's interview. Tr. at 36-38; Def't #4, Def't #5.

---

[2] According to Wirken, the referenced documents were matters of "public record" and documents previously turned over to the Internal Revenue Service. Tr. at 10, 12.

# PROPOSED CONCLUSIONS OF LAW

Prelogar asserts that the government's conduct in interviewing his former attorney violated the attorney-client privilege covering his relationship with Wirken. In his motion before the Court, Prelogar requests that the Court dismiss the case against him with prejudice based on a violation of the Sixth Amendment. In the alternative, Prelogar asks the Court to enter an order disqualifying any government attorneys who have come into possession of the information communicated during Wirken's interview on March 21, 2017. Prelogar's MOTION FOR REMEDY raises a series of sequential issues; namely:

(1) Did the interview between Wirken and Special Agent Churchman disclose information that was otherwise protected from disclosure by the attorney-client privilege?

(2) Even if otherwise privileged information was disclosed, did Prelogar waive the privilege by indicating to law enforcement officials that he acted in reliance on the advice of counsel?

(3) Finally, assuming that there was disclosure of privileged information and that there was no waiver, is Prelogar entitled to either of his proposed remedies?

The Court would note that the record is not clear that Wirken revealed attorney-client privileged information to Special Agent Churchman during the interview. Prelogar asserts that Wirken's mental impressions were effectively disclosed because Wirken indicated that Prelogar always followed his legal advice and Wirken confirmed his association with various financial dealings undertaken by Prelogar. While it is true that such facts tend to show an attorney's mental impressions, those easily-inferred-from-public-activities impressions are not privileged. If a client, after consulting with an attorney, files a case or sets up a business organization or takes some other particular action, it requires no great deductive prowess to ascertain the mental impressions of the attorney *viz-a-viz* the action taken. As testified to by Wirken:

> [Y]ou wouldn't have to be the smartest attorney to understand that
> what I did [as shown in the documents] was based upon advice that
> I gave to the clients and the clients gave me the go-ahead and do it
> . . . . [T]hey clearly knew the mental impressions that I had had
> with regard to why I basically set out [the plan for Prelogar's] asset
> protection the way I did.

Nonetheless, for purposes of consideration of the present motion, the Court will assume that the government solicited and obtained some information that would have been protected by the attorney-client privilege in the course of interviewing Wirken.

Similarly, the Court will assume that at the time of the interview, Prelogar had not sufficiently asserted an advice-of-counsel defense so as to waive any attorney-client privilege with respect to the interview with Wirken. Although there is some evidence to support such a waiver, the Court notes that when Wirken asserted the privilege during his interview neither Special Agent Churchman nor AUSA Becker argued for or asserted the presence of a waiver. As a consequence, in addressing the current motion, the Court assumes that Prelogar successfully navigated the first two inquiries and, as such, the Court will focus on the remedy issue.

Prelogar seeks a remedy from the Court based on an alleged violation of his "right to counsel" Sixth Amendment protections. However, those protections had not been triggered at the time of Wirken's interview – which occurred several months <u>before</u> Prelogar was indicted. As summarized by the Supreme Court:

> The initiation of judicial criminal proceedings is far from a mere
> formalism. It is the starting point of our whole system of adversary
> criminal justice. For it is only then that the government has
> committed itself to prosecute, and only then that the adverse
> positions of government and defendant have solidified. It is then
> that a defendant finds himself faced with the prosecutorial forces
> of organized society, and immersed in the intricacies of substantive
> and procedural criminal law. It is this point, therefore, that marks
> the commencement of the 'criminal prosecutions' to which alone
> the explicit guarantees of the Sixth Amendment are applicable.

*Kirby v. Illinois*, 406 U.S. 682, 689-90, 92 S. Ct. 1877, 1882 (1972). *See also Beck v. Bowersox*, 362 F.3d 1095, 1101 (8th Cir. 2004) ("In general, the Sixth Amendment right to counsel attaches when the [government] initiates an adversary judicial proceeding "by way of formal charge, preliminary hearing, indictment, information, or arraignment.").

While the Sixth Amendment has no application to these particular facts, it is well-settled that misconduct by law enforcement officials in collecting incriminating evidence may rise to the level of a due process violation under the Fifth Amendment when the misconduct is outrageous enough to shock the conscience of the court. *See*, *e.g.*, *Rochin v. California,* 342 U.S. 165, 172-74, 72 S.Ct. 205, --- (1952). As another court has noted:

> While a claim of a Sixth Amendment violation based on intrusion of attorney-client privilege is limited to government action which interferes with legal representation after the initiation of criminal proceedings, we acknowledge a defendant may claim his or her rights under the Due Process Clause have been violated by prosecutorial misconduct occurring prior to indictment.

*United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000). Indeed, in some extreme cases, courts have dismissed indictments after concluding that governmental misconduct in the form of a pre-indictment invasion of a defendant's attorney-client relationship amounted to a deprivation of the defendant's right to due process. *See*, *e.g.*, *United States v. Schell,* 775 F.2d 559, 562–66 (4th Cir.1985) (defendants' due process rights were violated when attorney represented them before grand jury but later participated in prosecution after indictments were issued.); *United States v. Marshank,* 777 F.Supp. 1507, 1521-23 (N.D. Cal.1991) (pre-indictment intrusion into attorney-client relationship was pervasive enough to warrant dismissal of indictment where defendant's attorney participated in investigation of his client and government knowingly assisted attorney in violating the attorney-client privilege and hid violation from the court). This case does not rise to such a level.

7

The defense of outrageous government conduct focuses on the government's actions. *United States v. Hunt,* 171 F.3d 1192, 1195 (8th Cir. 1999). The level of outrageousness needed to prove a due process violation is exceedingly high, and, at a minimum, the government's conduct must shock the conscience of the Court. *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003). *See also United States v. Bugh,* 701 F.3d 888, 894 (8th Cir. 2012) ("Outrageous Government conduct requires dismissal of a charge only if it falls within the narrow band of the most intolerable government conduct."); *Hunt*, 171 F.3d at 1195 ("[G]overnment agents may go a long way . . . without being deemed to have acted so outrageously as to violate due process."). The Eighth Circuit has noted that it "has not had occasion to opine on governmental intrusion into an attorney-client relationship in the context of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013).[3]

Cases from other Circuits, however, do not support Prelogar's request for a dismissal of the indictment in this case. An illustrative case is *United States v. White*, 970 F.2d 328 (7th Cir. 1992). In *White*, the defendants sought to have their convictions for bankruptcy fraud overturned because government agents "had procured a breach of their attorney-client privilege by obtaining information from their former bankruptcy attorney" during the criminal investigation. *Id*. at 330. More specifically, "the record indicate[d] that the government solicited [the former attorney's] cooperation to confirm the information it already had compiled concerning the assets missing from the bankruptcy schedules and to insure that [the defendants] could not assert that it was [the former attorney's] decision to omit the assets." *Id*. at 336. For purposes of the defendants' motion, the court assumed that the former attorney had disclosed

---

[3] In *Williams*, the Court acknowledged that such an intrusion could result in a Fifth Amendment violation, but concluded under the facts before it in that case, there was no attorney-client relationship. *Williams*, 720 F.3d at 690.

confidential information and that the government was complicit in the disclosure. Nonetheless, the Seventh Circuit found that reversal of the convictions was unwarranted:

> The attorney-client privilege is a testimonial privilege. Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results. . . . Any misconduct by the government and any resulting prejudice was limited strictly to the investigatory period preceding the trial.

*Id*. at 336.[4]

Similarly in *United States v. Rogers*, 751 F.2d 1074 (9th Cir. 1985), a defendant was charged with mail fraud and aiding and assisting the filing of a false tax return arising out of a tax shelter. During the pre-indictment criminal investigation, the lead agent with the Internal Revenue Service met with and interviewed the attorney who had represented the defendant at the time of the suspect financial transactions. *Id*. at 1075. After the defendant was indicted, he moved to have the charges dismissed based on "government misconduct in the form of interference with the attorney-client relationship." *Id*. at 1076. The district court granted the dismissal and the government appealed.

---

[4] The Court in *White* also addressed the issue of government complicity in the breach of the attorney-client privilege. The defendants in *White* asserted that their former attorney breached their confidences in exchange for leniency for his own criminal conduct in assisting the defendants. The court rejected the defendants' argument:

> [T]he government did not explicitly or implicitly guarantee [the attorney] leniency for information. While [the attorney] may have hoped his cooperation would impact his sentence, the [defendants] offer no more than speculation that the government procured a violation of the attorney-client privilege by dangling the carrot of lenient treatment in front of [the attorney].

*White*, 970 F.2d at 335. Somewhat similarly in this case, Prelogar repeatedly noted that Wirken was under federal supervised release at the time of the interview. However, Prelogar does not offer any evidence that the government promised (explicitly or implicitly) to shorten such release based on Wirken's interview.

On appeal, the Ninth Circuit reversed the dismissal, framing the issue on appeal as:

> The central question in this case is whether an agent of the Federal Government has improperly induced an attorney to breach his ethical duty of confidentiality to his client and, if so, whether that conduct was so outrageous,[5] and resulted in such prejudice to the defendant, as to justify dismissing the indictment with prejudice.

*Id*. at 1077. Like the Court in *White*, the *Rogers* court could not identify a level of "significant prejudice" to the defendant to justify a dismissal of the indictment.

> The fact that the [attorney's] disclosures might have encouraged the IRS to continue its investigation of [the defendant] and, ultimately, to seek an indictment does not justify dismissing the indictment. The prejudice relates only to the investigatory stage and does not affect [the defendant'] ability to defend himself at trial. There is a fundamental distinction between the use of privileged information at trial, and its use during the investigatory period.

*Id*. at 1079. The court found that the attorney interview only provided "the Government [with] knowledge that [the] tax shelters were not formulated as a result of the advice of counsel." *Id*. Such a fact did not support the "drastic remedy" of dismissal of the indictment.

---

[5] Like this Court, the *Rogers* court rejected any claim of a violation of the right-to-counsel under the Sixth Amendment. However, the *Rogers* court did not focus on the pre-indictment timing of the attorney interview, but rather on the status of the attorney as no longer representing the defendant:

> [T]his is not a case in which the defendant's sixth amendment right to counsel is involved. [The attorney was not] representing [the defendant] in defending against a criminal charge; [the attorney] was, instead, a potential witness because of past representation. Thus, cases in which a Government agent or Government informers violated a constitutional right of a defendant by interfering with the attorney-client relationship in the course of a criminal defense are not applicable. Here, we have only a situation in which a potential witness, who was an attorney, talked to federal agents about past representation of a client; this, at most, involved a breach of the attorney's ethical obligation of confidentiality.

*Id*. 1077-78.

Finally, in *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027 (D. Nev. 2006), a corporate defendant was indicted for alleged health care fraud. The defendant moved to dismiss the indictment arguing that the government – in executing its pre-indictment search warrants – had "improperly intruded on [the defendant's] attorney-client privilege" by accessing and reviewing numerous documents protected by the privilege. *Id*. at 1036. In addressing the motion, the *SDI* court noted that the "general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial." *Id*. at 1047. In order to obtain a dismissal of an indictment "or the imposition of other severe sanction," a court needed to find:

> (1) a violation of a defendant's right to counsel under the Sixth Amendment,
>
> (2) a violation of a defendant's right to substantive due process under the Fifth Amendment, or
>
> (3) conduct sufficient to trigger the court's inherent power to punish flagrant prosecutorial misconduct which causes defendant to suffer substantial prejudice.

*Id*.

The court easily disposed of the Sixth Amendment claim, finding that "[t]he Ninth Circuit adheres to the bright line rule that the Sixth Amendment right to counsel attaches only upon the initiation of formal criminal charges." *Id.* With regard to a Fifth Amendment outrageous-government-conduct, the court acknowledged that a defendant could assert such a claim for pre-indictment criminal investigative techniques. As explained by the *SDI* court, a colorable claim required a showing of: (1) governmental knowledge of the attorney-client relationship, (2) deliberate intrusion into that relationship, and (3) actual and substantial prejudice. *Id*. at 1049. The court emphasized however:

11

> [T]he governmental misconduct in deliberately intruding into the
> attorney-client relationship and prejudice suffered by a defendant
> must be very severe for the court to conclude that the
> government's misconduct violates "fundamental fairness, shocking
> to the universal sense of justice mandated by the Due Process
> Clause of the Fifth Amendment."

*Id.* (*quoting*, *in part*, *United States v. Russell*, 411 U.S. 423, 431, 93 S. Ct. 1637, 1643 (1973)). The *SDI* court concluded that the defendant had not shown any prejudice to support a dismissal of the indictment. *Compare United States v. Kennedy*, 225 F.3d 1187, 1194–97 (10th Cir. 2000) ("[The defendant has not] shown the prosecution's actions in interviewing [his attorney] and gathering evidence from him during its investigation were sufficiently outrageous to support granting a new trial or dismissing the indictment.").

In this case, the Court likewise does not find evidence of substantial prejudice sufficient to justify either dismissal of the indictment or disqualification of the prosecution team. Moreover, even if there was such evidence, it would only make Prelogar's claim colorable. The Court would still not be inclined to grant either of the proposed remedies because it does not find the government's conduct to be "outrageous" as that term of art is used in Fifth Amendment jurisprudence. A number of factors have influenced the Court:

(1) Wirken was only interviewed on a single occasion;

(2) it is not clear that any attorney-client privileged information was shared by Wirken;

(3) the statements made by Prelogar's attorney at the time of the interview could be interpreted as asserting an advice-of-counsel defense that would have waived any privilege; and

(4) Wirken was not actively representing Prelogar at the time of the interview and was not and is not representing him in his criminal defense in this matter.

As repeatedly noted in the cases considering remedies for government interference in a defendant's attorney-client relationship, the usual remedy is suppression of any privileged information disclosed to the government. In this case, Prelogar does not seek such a remedy. Moreover, the government has represented that it does not intend to utilize Wirken's testimony in its case-in-chief[6] in the event that this case proceeds to trial. Accordingly, given the limited nature of the remedies sought by Prelogar and the high showing required to substantiate such remedies, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** DEFENDANT'S MOTION FOR REMEDY FOLLOWING EVIDENTIARY HEARING [Doc. 67] filed on October 19, 2018.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                  /s/ *John T. Maughmer*
                                                   **John T. Maughmer**
                                     **United States Magistrate Judge**

---

[6] Obviously, at the time of trial, the government may seek to argue that Prelogar has "opened the door" to the receipt of such evidence and/or waived the privilege. The merits of such arguments will necessarily have to be weighed by the trial judge.